# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAMELA F. HENDRICKS, an adult individual, | )<br>)<br>) |
| Plaintiff, | )  Civil Action No. 13-491 |
| | )  Judge Nora Barry Fischer |
| v. | )<br>) |
| PITTSBURGH PUBLIC SCHOOLS,<br>Pittsburgh Faison Primary Campus, | )<br>)<br>) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

AND NOW, this 10th day of February, 2015, upon consideration of Defendant's Motion for Reconsideration, (Docket No. 36), and Brief in Support, (Docket No. 37), Plaintiff's Response in Opposition, (Docket No. 39), Defendant's Reply, (Docket No. 44), Plaintiff's Sur-Reply, (Docket No. 47), and the Court having convened Argument on said Motion, (Docket No. 48),

IT IS HEREBY ORDERED that Defendant's Motion is GRANTED, in part, and DENIED, in part. The Motion is GRANTED, to the extent that the Court's Memorandum Opinion, (Docket No. 34), is AMENDED, to correct the Court's error in finding that Leah Rae Bivins ("Ms. Bivins") was the Vice Principal of Faison during the 2009-2010 school year. The third sentence in the first paragraph of Section II.A., *id.*, now shall state: "For the 2009-2010 school year, JoAnn Hoover ("Ms. Hoover") was the Vice Principal and Yvonna K. Smith ("Ms. Smith") was the Principal." The Motion is DENIED in all other respects. For the reasons that follow, the correction of this factual error does not cause this Court to alter its holding in denying Defendant's Motion for Summary Judgment on the race discrimination claim. (*Id.*).

1

## I. STANDARD OF REVIEW

The purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence." *Kabacinski v. Bostrom Seating, Inc.*, 98 F. App'x 78, 81 (3d Cir. 2004) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). Because "federal courts have a strong interest in the finality of judgments," *United States v. Hoey*, 2011 WL 748152, at *2 (W.D.Pa. Feb.15, 2011) (citation omitted), the standard that must be met to prevail on a motion for reconsideration is high, *see Berry v. Jacobs IMC, LLC,* 99 F. App'x 405, 410 (3d Cir. 2004). The United States Court of Appeals for the Third Circuit explains that:

> [s]uch motions "are granted for 'compelling reasons,' such as a change in the law which reveals that an earlier ruling was erroneous, not for addressing arguments that a party should have raised earlier." *Solis v. Current Dev. Corp.*, 557 F.3d 772, 780 (7th Cir. 2009) (internal citations omitted). Though "[m]otions to reconsider empower the court to change course when a mistake has been made, they do not empower litigants ... to raise their arguments, piece by piece." *Id.*

*United States v. Dupree*, 617 F.3d 724, 732-33 (3d Cir. 2010).

The Court may grant a motion for reconsideration if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *United States v. Perminter*, 2012 WL 642530, at *3 (W.D. Pa. Feb. 28, 2012) (citing *Max's Seafood Café by Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). A motion for reconsideration is not a tool to re-litigate and reargue issues which have already been considered and disposed of by the Court, *see Hoey*, 2011 WL 748152, at *2 (citation omitted), or for addressing arguments that a party had the opportunity to raise before the

Court's decision, *see United States v. Dupree*, 617 F.3d 724, 732–33 (3d Cir. 2010) (quotations omitted). Rather, such a motion is appropriate only where the court misunderstood a party or where there has been a significant change in law or facts since the Court originally ruled on that issue. *Hoey*, 2011 WL 748152, at *2.

## II. ANALYSIS

### 1. Implication of the Court's Factual Error

Defendant argues that, because the Court misclassified Bivins as Vice Principal for the 2009-2010 school year, the Court must reconsider its denial of summary judgment on the race discrimination claim. (Docket No. 37). Specifically, Defendant contends that "there is undisputed record evidence that Bivins played no role (and was not even an administrator at Faison that year) when Plaintiff was placed on her first EIP and when she received her first Unsatisfactory rating." (Docket No. 37 at 4). Plaintiff avers that Ms. Bivins did observe her "on several occasions during the subject year." (*Id.*). Nevertheless, Plaintiff maintains that it is of no consequence whether Bivins was the primary observer, as Ms. Bivins had the "final say" on the second unsatisfactory rating that directly led to Plaintiff's termination. (Docket No. 39 at 2); (Docket No. 25-2 at 75).

Notwithstanding the factual error which was corrected by this Court, *supra*, Defendant has not provided this Court with any basis to grant its motion for summary judgment as to the race discrimination claim.[1] In this Court's estimation, the record supports Plaintiff's contention that Ms. Bivins was Plaintiff's superior during the 2010-2011 school year, (Docket Nos. 24, 33 at ¶¶ 23-24); did conduct observations, (*Id.* at ¶ 53); (Docket No. 30-1 at 13:10-19); and did

---

[1] This Court's Memorandum Opinion, (Docket No. 34), set forth the applicable standard of review and law on this issue. As such, the Court does not restate same herein.

recommend her for the second unsatisfactory rating, (Docket Nos. 24, 33 at ¶ 59). Despite Defendant's argument that Ms. Bivins "had no involvement in Plaintiff's first EIP and unsatisfactory rating" and that Ms. Hoover was the primary observer during both years in question, Ms. Bivins' name is listed on the "Administrator" line at the bottom of a Student Behavior Referral dated December 3, 2009. (Docket No. 25-2 at 45).

Moreover, during that year, Lora Bethea ("Ms. Bethea") testified that Ms. Bivins split the staff; some people were to be supervised by Ms. Hoover, the Vice Principal, and some people were to be supervised by Ms. Bivins. (*Id.* at 8:20-23). Special education and primary teachers were to be supervised by Ms. Hoover. (*Id.* at 8:23-24). Plaintiff was a special education teacher. (Docket Nos. 24, 33 at ¶ 19). There is evidence in the record, however, that at some point, Ms. Bivins began to supervise Plaintiff and did play a role in the 2009-2010 school year. *See, e.g.* (Docket No. 25-2 at 45) (Student Behavior Referral prepared by Administrator L. Bivins and dated 12/3/2009). In her deposition, Ms. Bivins could not pin-point her roles at Faison during the relevant time period:

> Q: When were you vice principal, and when were you principal?
> A: . . . I believe I was assistant principal there in — I don't know — I think 2009. See, I don't know. I was back and forth there about six times throughout my career. But I know most likely from 2008 to 2010 or so I served either as assistant principal there, interned there, or acting principal there.

(Docket No. 30-1 at 6:14-23). Ms. Bivins was asked if she had duties to oversee Plaintiff when she was a teacher at Faison. (*Id.* at 9:24-10:1). She responded, "Yes. During the time which I was assistant principal — I'm not sure when she came. As far as during the time which I was

4

assistant principal yes, and during the time I was an acting principal, yes, and a principal." (*Id.* at 10:2-7). When Ms. Bivins was an assistant principal, she said that she had to assist Plaintiff a lot and spend a lot of time supporting her. (*Id.* at 28:25-29:5). Further, Ms. Bivins testified that she was an acting principal the year prior to her becoming the principal at Faison, presumably during the year 2009-2010, because toward the end of that year, the principal went out on leave. (*Id.* at 8:15-18). When she was acting principal, she testified that part of her duties was to oversee Plaintiff. (*Id.* at 10:1-7). However, Ms. Bivins later testified that during the 2009-2010 school year, she had no involvement at Faison. (*Id.* at 48:24-49:5). The Court recognizes the above discrepancies in the record; yet, at the summary judgment stage, all inferences must be drawn in the light most favorable to Plaintiff. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Contrary to Defendant's arguments, this Court finds that Ms. Bivins played a role in Plaintiff's supervision and was privy to the relevant information from the first unsatisfactory rating. Plaintiff's EEOC Employment Questionnaire dated, dated March 31, 2011, indicates:

> Q: What happened to you that you believe was discriminatory?
> A: 10-7-2010 unfair evaluation of ability to teach black students because I am white.
> Q: Name and title of person responsible:
> A: Leah Bivins, Principal, Pittsburgh Faison Primary

(Docket No. 30-4 at 3). Ms. Hoover testified that the first unsatisfactory rating was given by Ms. Smith, (Docket No. 25-15 at 11:14), and that when Ms. Bivins came in, she wanted it to be continued the following year. (*Id.* at 12:12-14). Ms. Hoover also testified that Ms. Smith, the principal for the 2009-2010 school year, talked about the first unsatisfactory rating and reviewed "everything." (*Id.* at 12:13-21). She continued, "[Ms. Smith] went to her supervisors and reviewed everything with them, and agreed that it should be [an unsatisfactory rating.]" (*Id.* at

12:21-23). The record further reveals that during the 2010-2011 school year, Plaintiff met with Bivins, Hoover, and other administrators to discuss her need for "substantial improvement" based on her unsatisfactory rating from the 2009-2010 school year. (Docket No. 25-2 at 161). The Unsatisfactory rating packet for the 2010-2011 school year contains an "Overview" of Plaintiff's history. (*Id.* at 25-2 at 74-76). The second line of same states, "During the 2009-2010 school year, Ms. Hendricks was placed on an Employee Improvement Plan. Due to poor performance that year, Ms. Hendricks received an Unsatisfactory rating." (*Id.* at 76).

The Court's analysis is also supported by Plaintiff's testimony and notes. As to the latter, the Court points out that Plaintiff's notes were filed on the Docket by Defendant. (Docket No. 25-2). Similarly, other courts have considered such personal notes in this context at summary judgment proceedings. *See, e.g. Gov't Dev. Bank for Puerto Rico v. Holt Marine Terminal, Inc.*, 765 F. Supp. 2d 710, 716 (E.D. Pa. 2011) (relying on journal entries in opinion on motions for summary judgment in an ERISA case); *Bolden v. Magee Women's Hosp. of Univ. of Pittsburgh Med. Ctr.*, 2007 WL 1228479, at *9 (W.D. Pa. Apr. 24, 2007) *aff'd,* 281 F. App'x 88 (3d Cir. 2008) (considering Plaintiff's notes in an employment discrimination claim in ruling on summary judgment motions); *Arasteh v. MBNA Am. Bank, N.A.*, 146 F. Supp. 2d 476, 495 (D. Del. 2001) (considering Plaintiff's diary entries at the summary judgment stage in an employment discrimination case); *Engelhard Corp. v. M.C. Canfield Sons*, 1989 WL 418547, at *1 (D.N.J. Oct. 19, 1989) (noting that deposition testimony was corroborated by diary and workbook entries in ruling on summary judgment motions); *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (holding that the contents of employee's diary may be considered at the summary judgment stage in an employment discrimination case).

Plaintiff believed that, from the very beginning, Ms. Bivins made up her mind about placing her on the second EIP, which would result in a second unsatisfactory rating and, accordingly, cause Plaintiff to be terminated. (Docket No. 30-1 at 35:22-24) (Bivins' Deposition) ("Those who were on EIP and got a second unsat[isfactory rating] lost their position."). Plaintiff's notes from March 16, 2011 reveal that she thought it was "fishy" that Ms. Bivins became involved in evaluations. (Docket No. 25-2 at 180). She testified that Ms. Bivins observed her math lesson, and said that it was "really good." (Docket No. 25-1 at 89:19-20). However, Ms. Bivins then spent three hours dissecting the lesson and found "all these problems with it." (*Id.* at 89:20-22).

Ms. Bivins testified that, in making the determination to give Plaintiff the second unsatisfactory rating, she considered the informal and formal observations she made along with Ms. Hoover and Dealyn Allen ("Ms. Allen"). (Docket No. 25-6 at 13:10-12). Ms. Bivins also considered the support Plaintiff received from Amy Boyd, the curriculum coach, and Mary Young, the instructional teacher leader, in making said decision. (*Id.* at 13:10-19).

Yet, the record contains positive evidence of Plaintiff's ability to teach African American students. For example, her notes reveal that an African American grandmother complimented her work with her grandson noting that, "She knows that I worked hard with and for Shemar for 2 years. These people don't listen to you and Shemar needs somebody to listen and help him so he doesn't go to prison like so many AA [African American] males." (Docket No. 25-2 at 197). The school's reading teacher also complimented her abilities, and said that Plaintiff was "the best in the building." (Docket No. 25-1 at 43:18-22). Plaintiff testified that most of the students she taught went up to the next level. (*Id.* at 43:17-18). Despite all of this, Plaintiff still received an

unsatisfactory rating. As this Court noted it its earlier Memorandum Opinion, Ms. Bivins made that recommendation to the Superintendent. (Docket No. 25-6 at 11:4-7).

Turning to the alleged "hood" comments, Defendant argues that these statements by Ms. Bivens are "stray remarks" and those alone cannot establish pretext. (Docket No. 44 at 2). However, this Court's Memorandum Opinion based its holding as to pretext on several other factors, including the observations, the comparator teachers, and Ms. Bivens' involvement in the observations and her ultimate recommendation for an unsatisfactory rating. (Docket No. 34 at 10-11). Viewing the record in the light most favorable to Plaintiff, there are repeated instances wherein Plaintiff testifies and records, at or around the time of discrete events, these statements that were made. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (In considering evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.") (internal quotation marks and alterations omitted); (Docket No. 25-2 at 166-68); (Docket No. 25-1 at 31:25-32:5; 34:20-35:2). Ms. Bivins denied referring to Faison as the "hood" but acknowledged that she potentially used that word in a different context. (Docket No. 30-1 at 23:1-6). As the Court noted in its Memorandum Opinion, credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions. (Docket No. 34 at 7) (citing *Anderson*, 477 U.S. at 248); *see also Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir. 1987) ("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could always choose to discredit it."); *Tayoun v. City of Pittston*, 2014 WL 3943739, at *10 (M.D. Pa. Aug. 12, 2014) (same). Here, there is conflicting deposition testimony by Plaintiff, Ms. Bivins, and several others on material issues. The weighing of said testimony shall be resolved by a jury, not the Court at the summary judgment stage. *Bhaya*, at 262.

The record also contains evidence of Bivins' alleged racially offensive comments, their effect on Plaintiff, and the subsequent events. Plaintiff's notes state, "She 'Ms. Bivins' said it was a natural tendency for blacks especially to keep a tight rein on their children when company comes. She could not comment on white homes since she was not raised on one. She stated that in her home you better do what mom says and then stated "sisters" know what I mean." (Docket No. 2-2 at 164). Plaintiff testified that Ms. Bivins told her to look in the mirror, that she needed core authority, and that some people aren't made for the hood. (Docket No. 25-1 at 31:25-32:5). She then went to Ms. Hoover's office and said "I know I'm going to get an unsat[isfactory rating]. I need out of here. I need a transfer." (*Id.* at 32:19-22). She testified that Ms. Hoover said, "Mrs. Hendricks, I told you you should have gotten out of here last year. I told you you should have transferred last year." (*Id.* at 32:23-33:1). According to Plaintiff, on or about March 30, 2011, Ms. Bivins told her that the only reason they had the first unsatisfactory was to find out how to correct their problems for the second one." (*Id.* at 157:3-5; 15719-25). Further, Ms. Bivins told her she was going to get the second unsatisfactory. (*Id.* at 159:9-11).

Plaintiff's experiences at Faison as a whole and her relationship with Ms. Bivins are likewise documented in the record. Plaintiff testified that the 2010-2011 year at Faison was "like hell" and that it took everything she had to come into the building. (Docket No. 25-1 at 23:10-15). She added:

> I mean, it was horrible. It was horrendous. My husband doesn't even realize how bad it was coming in there every day and just — not even being talked to and being treated like — like you're not even a human being. I mean, she [Ms. Bivins] just — you know, nobody wanted to be around me when she was around. I mean — and then she would ask people, "Why are you talking to her? Why do you do things with her? You know, like, there was —it was just — it was just a horrendous environment"

9

(*Id.* at 161:4-16). In October 2010, Plaintiff was in a meeting with Ms. Flurry, the principal, the union liaison, and Ms. Bivins when Ms. Bivins made statements implying that she was not a good teacher. (Docket No. 25-1 at 98:2-99:3). Plaintiff testified that she received a phone call that October from another teacher, Ms. Davis, who said, "I heard that Ms. Bivins called you a bad teacher." (*Id*. at 99:4-12). She continued, "You'll be out of here by December." (*Id.* at 99:17-18). Around March 2011, Plaintiff testified that Ms. Bivins told her she would have to resign. (Docket No. 25-1 at 162:13-14). Plaintiff knew from "day one" that she would get an unsatisfactory rating. (*Id.* at 43:3-5).

As noted, she testified that it was horrible going to the school and like hell every day. (*Id.* at 42:9-1). She later described the year as "crazy" and testified that it never got any better. (*Id.* at 81:4-5). Because of her negative experiences at the school, Plaintiff took notes throughout the 2010-2011 school year and retained them. (Docket No. 25-1 at 40:24-41:4).

During this year, Plaintiff's issues at work manifested into physical illnesses. At the beginning of November, she had an anxiety attack. (*Id.* at 42:19-21). As a result, she received treatment from physicians who determined that her anxiety was work-related. (*Id.* at 145:7-13). Additionally, she testified that she had headaches every night causing her to vomit. (*Id.* at 78:10-14).

The record also contains evidence that, after Plaintiff complained of the racially offensive comments to her superior, Ms. Hoover, Ms. Bivins responded with a threat of termination. (Docket No. 25-1 at 50). Plaintiff noted that she had a discussion with Ms. Bivins on a Friday, when Bivins called her down to her office and:

> . . . basically, she told me that, how dare I go to Ms. Hoover with this information, did I think Ms. Hoover was her boss, and she said, "I said some people don't belong in the hood, I wasn't just

> directing it to you," you know, "there were other people in the room, and if you want to make an issue of this," she said, "I'll make it an issue, I'll make this personal." And she said, "You'll be out by December," and she was screaming at me."

(Docket No. 25-1 at 50:15-24). In addition to verbal comments and threats, Ms. Bivins also exhibited negative physical reactions to Plaintiff in front of other teachers. For example, Plaintiff testified that she rolled her eyes on November 17, 2010. (Docket No. 25-1 at 110:6-23).

Although the other teachers and supervisors may not recall the "hood" comment or other allegedly discriminatory acts by Ms. Bivins, this Court will not reconsider its denial of summary judgment based on such lack of recollection, as it creates a jury question. *See, e.g. United States v. Henry-Nesbitt*, 2011 WL 4565913, at *4 (D.V.I. Sept. 29, 2011) (denying summary judgment where Defendant's lack of recollection created a question of fact "not amenable to determination by summary judgment"); *Shaup v. Frederickson*, 1998 WL 726650, at *4 (E.D. Pa. Oct. 16, 1998) (denying summary judgment where Plaintiff's lack of recollection and other evidence created an evidentiary conflict to be decided by a jury at trial); *Gould Inc. v. A&M Battery & Tire Serv.*, 1996 WL 362594, at *2 (M.D. Pa. Apr. 17, 1996) (denying summary judgment and finding that a material element of fact exists when testimony establishes lack of recollection).

Defendant next argues that the Third Circuit's holding in *Keller v. Orix* requires this Court to reconsider its ruling as Ms. Bivins' alleged comments are stray remarks. 130 F.3d 1101 (3d Cir. 1997). This Court disagrees. Relative to the alleged discriminatory comments:

> To determine whether a statement can "constitute overt evidence sufficient to show ... a discriminatory animus towards older employees" the Third Circuit considers whether the speaker was a decisionmaker, the content of the statement and whether the statement was related to the decisional process. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 779 (3d Cir. 1994); *see also Price Waterhouse*, 490 U.S. at 277 ("[S]tatements by

11

> nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not show discriminatory intent)

*Kargbo v. Philadelphia Corp. for Aging*, 2014 WL 1632193 (E.D. Pa. Apr. 22, 2014). In order to constitute racial harassment, the subject comments or behavior need not be overtly racial in nature. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (observing that "there are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against [racial] discrimination" and harassment). In this Court's estimation, Ms. Bivins was the decisionmaker. Additionally, the statements and other actions that occurred while she was Plaintiff's superior were related to the decision-making process, as Bivins' alleged comments and actions went directly to Plaintiff's ability to teach African American students as a Caucasian.

Finally, with regard to the remaining issues of fact to be decided by a jury, the Court notes:

> Although we must also be vigilant to minimize the impact of groundless claims of bias on employers who have acted in good faith, summary judgment must not become a procedural expedient for resolving claims that raise a genuine issue of fact even though courts may be skeptical of the merits of the plaintiff's underlying claim.

*Williams v. URS Corp.*, 124 F. App'x 97, 101 (3d Cir. 2005). The Court has considered all evidence of record, including Plaintiff's testimony and notes, which were made at or around the time of the significant occurrences in this case, and finds that Defendant has not met its burden with respect to reconsideration of the race discrimination claim.

### 2. Alleged Error of Law as to Comparators

The Court likewise finds that Defendant has not met its burden with respect to reconsideration as to the comparator issue. Defendant's reliance on *Vogel v. Pittsburgh Public*

*School District* is misplaced. 2014 WL 4187151 (W.D.Pa. Aug. 21, 2014). First, In *Vogel*, Chief Judge Conti found that ". . . the record is devoid of any direct evidence of age-related animus or even stray age-related comments on the part of the relevant administrators." *Vogel*, 2014 WL 4187151, at *18. As the Court has discussed in its Memorandum Opinion, (Docket No. 34), and above, this is not the case here.

Next, the plaintiff in *Vogel* challenged the rating process at the school in question in arguing that he was discriminated against based on age, and Defendant countered with statistical evidence concerning the composition of the school's teachers. *Id.* at *19. Here, Defendant argues that fourteen of the twenty-six teachers were African American and the remaining twelve were Caucasian, (Docket No. 24 at ¶¶ 135-36), while Plaintiff specifically denied same in her responsive Concise Statement of Material Facts and testified to the contrary. (Docket No. 33 at ¶¶ 135-37). Specifically, Plaintiff testified that the majority of the curriculum teachers at Faison were African American and that she was a minority in the school. (Docket No. 25-1 at 163:17-20; 166:6-7). Plaintiff also argues that the majority, if not all, of Plaintiff's fellow teachers were African American and not terminated. (Docket No. 39 at 4). Additionally, Plaintiff testified that during the 2009-2010 school year, Ms. Harper, an African American, was also on an EIP. (Docket No. 25-1 at 72:12-18). She testified that Ms. Harper got an unsatisfactory rating and taught at summer school, which is ordinarily not permitted. (*Id.* at 82:10-14). Plaintiff's notes also state that Ms. Harper told her that:

> another white female is under constant reprimand by Ms. Bivins. I talked to this teacher briefly and she stated that she has had trouble sleeping as I have and it has been difficult. She states that she can do nothing right. I know exactly what she means, I experience this daily, yet other teachers in this building are having discipline problems, and they are treated much differently. They are treated with more respect and dignity, than I have experienced.

13

(Docket No. 25-2 at 197). Similarly, in Plaintiff's answer to Defendant's Interrogatory Number 18, she pointed out:

> Ms. Bethea told the students after lunch that at the end of the day they would be getting a treat if they were well behaved. Plaintiff mentioned this to the students during her math lesson, which Ms. Bivins was observing. Ms. Bivins stated to Plaintiff that food was not to be used to "motivate positive behavior." All of the teachers in the first grade Pod used "edible incentives" in their classroom. Ms. Bethea used a chart to award "table points" in her room. Plaintiff used this method during an observation and was written up because the process was too lengthy. This was a daily practice in Ms. Bethea's room.

(Docket No. 25-16 at 2).

Here, while statistical evidence was placed in the record, there is also conflicting testimony regarding the racial composition of the school at the time and about the treatment of other Caucasian teachers by Ms. Bivins. Again, such credibility determinations are in the province of the jury. *Anderson*, 477 U.S. at 248. Moreover, all evidence must be viewed in the light most favorable to Plaintiff. *Marino*, 358 F.3d at 247. In sum, Defendant has not set forth a manifest error of law or fact or presented newly discovered evidence as to the comparator issue. Thus, the Motion is denied as to this argument, as well.

### III. CONCLUSION

Defendant's Motion is GRANTED, in part, and DENIED, in part. The Motion is GRANTED, to the extent that the Court's Memorandum Opinion, (Docket No. 34), is AMENDED, only to correct the Court's error in finding that Leah Rae Bivins ("Ms. Bivins") was the Vice Principal of Faison during the 2009-2010 school year. The third sentence in the first paragraph of Section II.A., *id.*, now shall state: "For the 2009-2010 school year, JoAnn

Hoover ("Ms. Hoover") was the Vice Principal and Yvonna K. Smith ("Ms. Smith") was the Principal." The Motion is DENIED in all other respects.

IT IS FINALLY ORDERED that a Status Conference is hereby scheduled for **February 17, 2015 at 9:00 a.m.** to set a trial date and establish deadlines for the Court's Pretrial Order.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record